FILED

06/18/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2020

## IN RE JOHNATHAN T. ET AL.

**Appeal from the Juvenile Court for Campbell County**
**No. 2019-JC-4        Amanda Sammons, Judge**

_____

## No. E2019-01398-COA-R3-PT

_____

Jodie T. ("Mother") appeals the termination of her parental rights to the minor children, Johnathan T., Jaylynn T., Jayla T., Johnna T., and Jaydan T. (collectively, "the Children"). In January 2019, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate Mother's rights to the Children in the Campbell County Juvenile Court ("Juvenile Court"). Following a hearing in June 2019, the Juvenile Court terminated Mother's parental rights after finding that DCS had proven the statutory ground of substantial noncompliance with the permanency plans and that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Grae A. Hinds, Knoxville, Tennessee, for the appellant, Jodie T.

Herbert H. Slatery, III, Attorney General and Reporter, and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

DCS became involved with the Children after the Juvenile Court entered a "Temporary Bench Order of Custody" in November 2017, placing the oldest child, Johnathan, into DCS custody upon its determination that probable cause existed to believe Johnathan was dependent and neglected. Also in November 2017, DCS subsequently filed a petition to transfer legal custody of Johnathan's siblings to the custody of their grandparents. DCS also began a trial home visit with Johnathan in the grandparents' home. In January 2018, the Juvenile Court entered an adjudicatory hearing order which reflected that both parents stipulated that the Children were dependent and neglected at the time of their removals due to the parents' substance abuse issues existing at that time.

While Johnathan was in DCS custody, DCS created a permanency plan in January 2018, which reflected that Mother had completed an alcohol and drug assessment. She had also begun the "STOP Program" through Ridgeview. This plan also stated that Mother had completed a mental health intake at Ridgeview and had begun individual therapy and medication management. Additionally, Mother had begun parenting education classes. The plan required Mother to submit to random drug screens and pill counts and maintain housing and income. Following the conclusion of Johnathan's trial home visit, custody of Johnathan was released from DCS and placed with the grandparents.

Subsequently, the Children's behavioral issues became more than the grandparents could handle, and they were unable to continue caring for the Children. In April 2018, DCS filed a petition requesting that custody of the Children be placed with DCS. At a subsequent adjudicatory hearing, the parents stipulated to "continued unavailability based on the prior adjudication." The Juvenile Court, therefore, found the Children to be dependent and neglected and determined that the Children should remain in DCS custody.

DCS developed a permanency plan for all of the Children in May 2018, which included the following requirements for Mother: (1) follow all recommendations from a mental health assessment upon completion of the STOP Program, (2) provide a copy of the mental health assessment to DCS and sign a release to allow DCS to obtain records; (3) follow all recommendations from her alcohol and drug assessment upon completion of the STOP Program, (4) provide a copy of the alcohol and drug assessment to DCS, (5) submit to and pass random drug screens and pill counts, (6) attend therapeutic visitation with the Children, (7) attend family therapy, (8) allow DCS to conduct home visits and provide proof of utilities and housing, (9) provide proof of employment, (10) obtain

reliable and legal transportation, and (11) pay child support. Mother did not participate in the development of the plan but was provided a copy of the plan. However, Mother was present in court when the plan was approved by the Juvenile Court. In its June 2018 permanency hearing order, the Juvenile Court found that the requirements in the plan were reasonably related to the reasons necessitating foster care and in the Children's best interest.

Mother's home burned in September 2018. DCS developed a subsequent permanency plan in October 2018, with an additional requirement that Mother obtain and maintain safe and stable housing. This permanency plan included the previous requirement that Mother follow recommendations from a mental health assessment upon completion of the STOP program but also specifically required Mother to have a mental health assessment to address her mental health needs. Mother participated in the development of this plan. The Juvenile Court held a permanency hearing in October 2018, in which Mother was in attendance. The Juvenile Court found that the requirements of this plan were reasonable and related to the reasons the Children were in foster care and were in the Children's best interest. DCS subsequently developed a permanency plan in March 2019, which added an additional requirement that Mother attend all court dates concerning her pending criminal charges.

In January 2019, DCS filed a petition to terminate Mother's parental rights to the Children.[1] The Juvenile Court conducted a trial in June 2019. Mother failed to appear for trial. The Juvenile Court heard testimony during trial from John P. ("Father") and Emely Ford, the Children's DCS case manager. Following trial, the Juvenile Court found that DCS had proven by clear and convincing evidence the statutory ground of substantial noncompliance with the permanency plan and that termination of Mother's parental rights was in the Children's best interest. In its July 2019 judgment, the Juvenile Court found as follows as relevant to the termination of Mother's parental rights:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

* * *

On January 10, 2018, the Court found by clear and convincing evidence that the children were dependent and neglected due to the parents' substance abuse issues.

Subsequent to the removal of the children, the Department made reasonable efforts to assist the parents to be reunified with their children including referring the parents for an alcohol and drug assessment and

---

[1] DCS's petition also sought to terminate Father's parental rights, but he is not a party to this appeal.

- 3 -

referral to services to complete recommendations from the assessment; referring the parents for a mental health assessment; providing drug tests to the parents; providing child and family team meetings; providing visitation with the children; assisted with housing; providing ongoing case management; providing medical care and dental care for the children; providing ongoing advice and recommendations to the parents; providing daily care and support for the children; and developing a plan for reunification with the parents.

Despite these reasonable efforts by the Department, the parents failed to make similar reasonable efforts to be reunified with their children. The parents have either refused drug screens or failed drug screens. The parents have failed to complete recommendations from their alcohol and drug assessments. The parents have failed to fully address their substance abuse issue and continue to abuse illegal substances. The parents do not [have] safe and appropriate housing for the children. In short, neither parent has substantially complied with their requirements under the permanency plans. Returning the children to the parents at this time would certainly cause the children to be further subjected to abuse or neglect and there is no indication that the parents will be willing or able to remedy their circumstances and conditions in a timely manner, if at all.

The children are in a safe and appropriate foster home. The children are thriving in this environment and would be harmed if removed from this environment.

* * *

### GROUND ONE
### SUBSTANTIAL NONCOMPLIANCE WITH PERMANENCY PLAN
### T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2)
### As to Both Parents

In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that despite reasonable efforts by the Department to assist them, the mother and father have willfully failed to substantially comply with their requirements under the permanency plan designed to facilitate reunification of the children with them.

The Court finds that poverty is not what led to this situation. It is free to pee in a cup; it is free to show up to visits; free to complete inpatient

or outpatient drug treatment at Ridgeview when you have Tenncare and that was what was offered to both of these parents. It is not a matter of money or finances at all. It is quite unfortunate that the parents' house burnt in September 2018. But it is duly noted that mother did not stop paying for methamphetamine and the father did not stop using drugs either. The parents failed drug tests or would not give a urine sample for a drug test. The father admitted on the stand today that he has not fully addressed his substance abuse issues. The problem with these children is that they have been severely neglected due to drug use and domestic violence in the home of the parents. When the parents were first given the opportunity to have input on the permanency plan when the children were removed, the parents did not show up to do so. The mother and father tested positive for suboxone when the children were first removed. FSW Emely Ford tried to visit the home of the parents on several occasions after the children were removed. The child, Johnathan, came into state's custody due to a domestic assault charge on his own mother. There was also domestic abuse going on in the home with the parents.

The parents were required to complete an alcohol and drug assessment and follow all recommendations; complete a mental health assessment and follow all recommendations; obtain stable housing, transportation, and income; comply with random drug tests; participate in visits; and pay child support. The parents have not completed the recommendations from their alcohol and drug assessments; they have not completed a mental health assessment; they have either failed drug tests or refused to give a sample for the drug tests; the parents do not have stable housing, income, or transportation; they have not paid child support.

FSW Emely Ford testified that the only poverty issue on this case was housing and transportation. The court agrees with that. The Court focuses on the main requirements which led to the removal which was substance abuse. Both parents completed an alcohol and drug assessment which had subsequent recommendations for treatment. The parents already had an established relationship with Ridgeview. The father was recommended to complete the stop program through Ridgeview and he didn't complete it. The mother was recommended to complete intensive outpatient treatment ("IOP") and did not complete it. The mother's current whereabouts are currently unknown. As far as the mental health assessment, neither of the parents ever completed a mental health assessment which was available to be completed at Ridgeview free of charge. In reference to income, the father is not poor. He earns $10.00 per hour and keeps it all to himself and does not pay child support. The father

- 5 -

testified to that and states that it is hard to do it all on his own. The father has not paid child support and is not on disability. The parents [had] consistent visits until April 2019 when visits stopped. The Court is of the opinion that the behaviors of the children have to do with the neglect by their parents. The testimony is that the children have been in multiple placements because of behaviors because they have learned their behaviors from the parents. The children fight for attention of their parents because they are severely neglected.

As to substance abuse and drug tests, the following are the results of drug screens given to the parents. On June 13, 2018 – mother refuses a drug screen and does not give one. The father was negative but the temperature was too low which means that he falsified the drug test. A person cannot pee in a cup and it be cold. On June 21, 2018, both parents were negative. On August 13, 2018, the father would not submit to a drug test. The mother tested positive for suboxone and methamphetamine. On August 30, 2018, the father was negative. The mother would not give a sample. On September 18, 2018, the father was negative on drug test. The mother tested positive for methamphetamine and amphetamine. On September 25, 2018, the father is negative. The mother is positive for methamphetamine. [In] October 2018, hair follicle was requested of the parents and neither showed up to complete the hair follicle test. On November 27, 2018, the mother and father refused to give a sample. On March 29, 2019, the mother was negative. On April 2019, the father refused a drug test. The father refused multiple drug tests which are failed drug tests according to the court.

The parents were invited to the CFTMs and never showed up for the meetings. The parents are not drug free and have not shown any ability to overcome substance abuse issues. The more stability these children have is in their best interest. Testimony that the mother and father have been arrested on multiple charges since the children came into custody. The mother was arrested on charges of possession of drug paraphernalia and failure to appear. The parents contacted the Department from various different phone numbers which shows the Court that they are not in a stable place to care for the children. The father admitted on the stand that he has gone to jail many times for domestic violence with the mother, Jodi. Neither parent has made sufficient progress on the permanency plan for the children to be safely returned to their custody.

\* \* \*

## BEST INTEREST

Under Tenn. Code Ann. § 36-1-113(i)(1), the Court is required to find that termination of parental rights is in the child's best interest. In this case, the Court finds that there is clear and convincing evidence that termination of [Mother's] and [Father's] parental rights is in the best interest of the children in that despite reasonable efforts by the Department to assist the parents, the parents have failed to make adjustments to their conduct, circumstances, and lifestyles that would make it safe for the children to return home; the parents have a codependent relationship with their children and it is not very meaningful; a change of caretakers at this time would be detrimental and harmful to the children; there is domestic violence and substance abuse in the parents' home and the parents have exposed the children to both; the continued substance abuse by the parents makes them both consistently unable to care for the children in a safe and stable manner; and the parents have not paid child support for the children.

Mother timely appealed to this Court.[2]

## Discussion

Although not stated exactly as such, Mother raises the following issue for our review: Whether the Juvenile Court erred by determining that DCS had proven by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*,

---

[2] Father also filed a notice of appeal, but his appeal was dismissed after he failed to file an appellate brief or respond to this Court's order requiring Father to show cause why his appeal should not be dismissed.

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[5] Tenn. Code Ann. § 36-1-113(i).

- 9 -

law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Although Mother does not raise an issue for review concerning the statutory ground utilized for termination of her parental rights, we nonetheless will review the Juvenile Court's findings concerning statutory grounds for termination of parental rights as directed by our Supreme Court in *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). The Juvenile Court found only one statutory ground for termination of Mother's parental rights, substantial noncompliance with the reasonable requirements of the permanency plans. As relevant, Tennessee Code Annotated § 36-1-113(g)(2) (Supp. 2019) provides as a statutory ground for termination of parental rights as follows:

There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

The Juvenile Court found that, pursuant to the court-approved permanency plans, Mother was required to "complete an alcohol and drug assessment and follow all recommendations; complete a mental health assessment and follow all recommendations; obtain stable housing, transportation, and income; comply with random drug tests; participate in visits; and pay child support." The Juvenile Court found that the only requirements on the permanency plan that were affected by poverty were obtaining stable housing and transportation. The Juvenile Court, therefore, focused on the remaining requirements that related to Mother's substance abuse.

As required by the permanency plans, Mother had consistently visited with the Children. Mother was also required by the permanency plans to complete a mental health assessment. The Juvenile Court found that Mother already had established a relationship with Ridgeview and that she could have had a free assessment. Mother, however, did not complete the mental health assessment.

Mother complied with the requirement that she complete an alcohol and drug assessment. The alcohol and drug assessment recommended that Mother complete intensive outpatient drug treatment. Although Mother attended a detox program, she failed to complete the recommended intensive outpatient treatment.

Concerning drug screen results throughout the case, the Juvenile Court found that Mother refused to take a drug screen on June 13, 2018. Mother subsequently passed a drug screen on June 21, 2018. On August 13, 2018, Mother tested positive for methamphetamine and Suboxone. Mother later refused to provide a drug screen on August 30, 2018. Mother did comply with a drug screen on September 18, 2018, and tested positive for methamphetamine and amphetamines. On September 25, 2018, Mother tested positive for methamphetamine. Mother was requested to complete a hair follicle drug screen in October 2018 but failed to comply. Mother subsequently refused to comply with a drug screen request in November 2018. Mother later passed a drug

screen in March 2019.  The permanency plans required Mother to comply with and pass random drug screens.  Mother refused to comply with drug screen requests four times while the Children were in DCS custody.  Although Mother complied with drug screens on several occasions, she failed each drug screen except for two.  Mother clearly had not addressed her substance abuse issues.  The evidence presented does not preponderate against the findings of fact made by the Juvenile Court concerning this statutory ground. We find and hold, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plans was proven by clear and convincing evidence.

Finally, having determined that a statutory ground exists for the termination of Mother's parental rights, we next address the best interest analysis.  Mother has raised the best interest analysis as an issue on appeal and argues that the Juvenile Court erred by determining that it was in the Children's best interest for her parental rights to be terminated.  Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)      In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)      Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)      Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)      Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)      Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)      The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)      Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional

or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be

- 13 -

resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

As acknowledged by Mother in her appellate brief, the Juvenile Court considered the factors in Tennessee Code Annotated § 36-1-113(i). Mother argues, however, that the Juvenile Court erred by determining that these factors weighed in favor of terminating her parental rights.

Concerning factors (1) and (2), the Juvenile Court found that DCS had provided reasonable efforts to assist Mother in remedying the reasons the Children were in foster care but that Mother had failed to make a lasting adjustment to her conduct, circumstances, or lifestyle such that it would be safe for the Children to return to her home. The Juvenile Court found that DCS's efforts consisted of referring Mother for her alcohol and drug assessment, referring her to services where Mother could complete the recommendations from that assessment, referring Mother to a mental health assessment, providing Mother with random drug screens, organizing child and family team meetings, providing visitation for Mother and the Children, assisting Mother in finding suitable housing, providing ongoing case management, providing medical and dental care for the Children, providing Mother with ongoing advice and recommendations, providing daily

- 14 -

care and support for the Children, and developing a permanency plan to help reunite Mother with the Children. Despite DCS's efforts, Mother had not remedied her substances abuse issues, had failed multiple drug tests while the Children were in foster care, and had pending criminal charges and an active warrant for her arrest on the day of trial.

Concerning factor (3), the Juvenile Court found in its judgment that Mother had visited the Children consistently until April 2019. Mother had not visited the Children after that time because Ms. Ford was unable to contact Mother. Although Mother had maintained visitation with the Children for most of the time they were in foster care, the Juvenile Court found, pursuant to factor (4), that Mother had a co-dependent relationship with the Children and that the relationship was not meaningful.

As relevant to factor (5), the Juvenile Court's judgment stated that changing the Children's caretakers at this point would be detrimental and harmful to the Children but does not further explain this finding. In its oral ruling, the Juvenile Court mentioned Mother's ongoing drug use and her mental health condition. We note a lack of evidence in the record concerning Mother's mental health diagnoses but an abundance of evidence concerning Mother's drug use. Also in its oral ruling, the Juvenile Court acknowledged that the Children's placements may not be pre-adoptive but stated that it was crucial to the Children's emotional, psychological, and medical condition for the Children to remain in foster care with stable foster families rather than return to Mother as the caretaker.

Additionally, the Juvenile Court found that as to factor (7), Mother had both substance abuse and domestic violence in the home and that she had exposed the Children to both. The Juvenile Court further found that Mother's continued substance abuse made her consistently unable to care for the Children in a safe and stable manner. Finally, as relevant to factor (9), the Juvenile Court found that Mother had not paid child support for the Children. The evidence presented does not preponderate against the Juvenile Court's findings regarding best interest.

On appeal, Mother argues that the Juvenile Court erred by failing to consider the Children's placement in separate foster homes. Mother argues that there is a rebuttable presumption against splitting up siblings. *See Ray v. Ray*, 83 S.W.3d 726, 738 (Tenn. Ct. App. 2001). This Court has explained that "[t]he preference for keeping siblings together 'is simply a factor for the court to consider in determining the best interest of the child . . . . It is not a controlling factor. Courts have previously separated siblings if separation was in the best interest of the child before the court." *Grigsby v. Alvis-Crawford*, No. W2016-00393-COA-R3-JV, 2017 WL 417221, at *4 (Tenn. Ct. App. Jan. 31, 2017) (quoting *In re S.B.*, No. M1999-00140-COA-R3-CV, 2000 WL 575934, at *5 (Tenn. Ct. App. May 12, 2000)).

In this case, the Children were placed initially into the custody of family members. Due to the Children's behavioral issues, the Children subsequently were placed into DCS custody. At the time of trial, the Children were in three separate homes. The Juvenile Court heard evidence concerning the Children's separate placements and also acknowledged in its judgment the multiple placements the Children have had while in foster care due to their behavioral issues. The Juvenile Court found that those behaviors were caused by the neglect they received from the parents and having to "fight for the attention of their parents." Although the Juvenile Court does not specifically address the Children's placement in separate foster homes at the time of trial, the fact that the Children are in separate homes does not outweigh the other statutory factors favoring the termination of Mother's parental rights.

We acknowledge that Johnathan does not wish to be adopted. We note that Johnathan will be eighteen years old in September 2020. Ms. Ford testified during trial that the foster parents of the three children, Jaylynn, Jayla, and Jayden, were considering adopting those children and "possibly Johnna." With Johnathan turning eighteen and not wishing to be adopted, the four younger siblings still have a chance at adoption and stability. By the time of the termination trial, Mother had made very little progress to remedy her substance abuse issues which was the main reason the Children were removed from her custody. The Children were doing well in their current placements and returning the Children to Mother's custody with her continuing substance abuse would not be in their best interest. We find and hold, as did the Juvenile Court, that DCS had proven by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. We, therefore, affirm the judgment of the Juvenile Court.

## Conclusion

The judgment of the Juvenile Court terminating Mother's parental rights to the Children is affirmed. This cause is remanded to the Juvenile Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Jodie T., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE